50 CCPA

## Application of Alois M. GEMASSMER.

### Patent Appeal No. 6945.

United States Court of Customs and Patent Appeals.
June 28, 1963.

---

2. Among the decisions cited are Loukomsky v. Gerlich, 264 F.2d 907, 46 CCPA 805 and Den Beste v. Martin, 252 F.2d 302, 45 CCPA 798.

3. See decisions in footnote 2.

Clelle W. Upchurch, Pittsburgh, Pa. (John H. Sutherland, St. Louis, Mo., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Judges.

MARTIN, Judge.

This appeal is from a decision of the Board of Appeals affirming the examiner's rejection of claims 10–20 for PREPARATION OF ORGANIC ISOCYANATES.[1] Fifteen claims have been allowed.

Claim 10, representative of the appealed claims,[2] reads:

"10. In a method of preparing aromatic isocyanates by reacting, in an inert organic solvent, a stoichiometric excess of phosgene with a compound selected from the group consisting of aromatic primary mono-, di-, and polyamines having no substituents other than primary amino which are capable of reacting with phosgene under the conditions employed, to form the corresponding isocyanate, the improvement which comprises carrying out the initial phosgenation at a temperature within the range of 60°C. to 80°C. to produce an intermediate product, which contains an admixture of the desired isocyanate and the corresponding intermediate carbamyl chloride, and reacting said intermediate product in the presence of phosgene at a higher temperature to produce the aromatic isocyanate."

Appellant's application describes an improved process for the preparation of an organic isocyanate. As pointed out in appellant's specification, it is known in the art that an organic isocyanate can be prepared by reacting phosgene and an amine in two steps:

(1) a primary or cold phosgenation step in which an amine is *mixed* and reacted with phosgene to form carbamyl chloride and an amine hydrochloride, the temperature of the reaction medium being maintained at a point not above 60°C. in order to limit the amount of undesirable by-products.

(2) a second or hot phosgenation step wherein the reaction mixture from the primary phosgenation step is heated to a temperature of from about 100°C. to about 200°C. while introducing additional phosgene to convert the "carbamyl chloride and amine hydrochloride" into an organic isocyanate.

In the foregoing process, to insure the low temperature in the primary phosgenation step, it is necessary to mix the amine and phosgene together at a relatively slow rate and to furnish external refrigeration. Because of the relatively low temperature however, the chemical reaction in the primary phosgenation step is relatively slow so that the primary phosgenation step takes as much as one hour or more. An object of appellant's invention is to provide a method for making an organic isocyanate which is devoid of the disadvantages inherent in the above primary phosgenation step. Another object is to provide a method for making an organic isocyanate from an amine and phosgene without a prolonged primary phosgenation step and without

1. Ser. No. 765,298 filed October 6, 1958.

2. These claims have been copied, in modified form, for interference purposes, from

U.S. 2,908,703, issued October 13, 1959 to Harold K. Latourette and Oscar H. Johnson, on application Ser. No. 528,846 filed October 16, 1955.

the need of refrigerating the reaction medium during the primary phosgenation step. A further object is to provide a method for making an organic isocyanate which is adaptable for a greater throughput and greater yield per unit of time with equipment of a given size. Appellant points out in his specification that the foregoing objects and others are accomplished in accordance with his invention, generally speaking, "by providing a process in which an amine, either in solution or suspension in an inert solvent, is contacted with phosgene in a high speed mixer." Appellant finds it unnecessary to cool the reaction medium in the primary phosgenation step since he finds that any temperature not substantially above 80°C. can be tolerated when a high speed mixer is used.

The examiner's sole ground of rejection is that appellant does not have proper support in his specification for a process of reacting an amine and phosgene to form an isocyanate which process is carried out in the absence of a high speed mixer and, therefore, that the appealed claims are too broad in the lack of a recitation of a provision for high speed mixing in the initial or primary phosgenation step.

Appellant contends that the appealed claims are not too broad and urges that those claims have adequate support in his specification.

The board in sustaining the examiner's rejection stated:

"Appealed claims 10 to 20 are not limited as required by appellant's disclosure in the foregoing respect [operation of the reaction in the initial phosgenation step in a high speed mixer] and we must therefore agree with the Examiner that these appealed claims are too broad and unsupported."

After a careful analysis of appellant's application we are convinced that there is no reversible error in that position of the board.

Appellant wishes to provide a method for making an organic isocyanate from an amine and phosgene without a prolonged primary phosgenation step and without the necessity of refrigerating the reaction mixture in the primary phosgenation. Appellant teaches that this is accomplished, generally speaking,

"by providing a process in which an amine, either in solution or suspension in an inert solvent, is contacted with phosgene *in a high speed mixer.*" [Emphasis ours.]

Appellant finds it unnecessary to cool the reaction mixture in the primary phosgenation step because:

"temperatures of above 60°C. do not adversely affect the yield when mixing is effected *in a high speed mixer.*" [Emphasis ours.]

As for the type of high speed mixer appellant points out in the specification that:

"Any suitable *high speed mixer* is contemplated by the invention, such as, for example, turbo mixers, colloid mills, pumps including centrifugal pumps, and the like, *which contain structural elements which rotate at high speeds and thus insure intimate contact between the amine and phosgene within a relative short period of time.* Preferably, the high speed mixer should be one which rotates at a speed of about 1000 rpm or more. In any event, *intimate mixing must be achieved in not substantially more than one minute.* * * * The residence time *in a high speed mixer* must be relatively short and, generally, it is preferred that the reactants not remain in the mixer for substantially more than one minute." [Emphasis ours.]

Each of appellant's examples include the use of a turbo mixer, colloid mill or centrifugal pump in the primary phosgenation step and it is evident, from the above quotation, that appellant uses the turbo mixer, colloid mill or centrifugal pump as a high speed mixer.

From our consideration of appellant's entire specification, it is apparent that it adequately defines, at least, what ap-

pellant intended in using the term "high speed mixer." Moreover, from our analysis of appellant's entire disclosure, we are convinced that he regarded his invention as requiring that the primary or initial phosgenation step be carried out in a high speed mixer which provides the intimate mixing of the amine and phosgene in not substantially more than one minute.

Appellant emphasizes that his specification includes the following statement:

"Depending upon the speed of the mixer, the reactants may be fed to the mixer continuously at any rate desired."

However, that statement must be considered in connection with the remaining language of the paragraph in which it appears:

"In one embodiment of the process provided by this invention, a solution of phosgene and a solution of an amine are introduced through separate conduits into a *high speed mixer*. The reactants remain in this *mixer* for only a few seconds and are fed to a suitable vessel where the reaction mixture is heated to a temperature of about 100°C. or more and phosgene is added to convert the carbamyl chloride into an isocyanate. Depending upon the speed of the *mixer*, the reactants may be fed to the mixer continuously at any rate desired. Likewise, the rate of flow of reaction mixture into the apparatus wherein the hot phosgenation is conducted may be varied widely without adversely affecting the yield. The temperature of the reactor used for the hot phosgenation may be maintained at the desired reaction temperature from the very outset which makes it possible to carry out the hot phosgenation continuously." [Emphasis ours.]

When the statement is so considered, it is apparent that the term "mixer" in that statement relates back to the term "a high speed mixer" appearing earlier in the paragraph. We are unable to find any basis for regarding the statement in question as disclosing any such speed variation in the primary phosgenation step as would result in anything but high speed mixing which is achieved in not substantially more than one minute.

It seems to us that the use of a high speed mixer (high speed in contrast to time of prior art mixing) being disclosed by appellant as essential to achieve his invention, is a critical limitation of his process. We therefore do not consider that the appealed claims, in the absence of language defining this limitation, point out appellant's invention nor do they have proper support in his specification.

The decision of the board is affirmed.

Affirmed.

WORLEY, C. J., not present at argument, participated by agreement of counsel in this decision.

RICH, Judge, with whom SMITH, Judge, joins (dissenting).

The sole issue is whether appellant's application contains a disclosure *broad enough to support the claims before us.*

The main flaw I see in the majority opinion is its preoccupation with those portions of appellant's disclosure which relate to the subject matter of the *allowed* claims, all of which have the "high speed mixer" limitation. To my mind this is a consideration irrelevant to the issue which faces us. The only question we have to answer is whether *in addition* to supporting the allowed claims, appellant's disclosure supports the claims on appeal. I think it does.

Appellant's specification defines the "high speed mixer" as "Preferably * * one which rotates at a speed of about 1000 rpm or more." Turbo mixers, colloid mills and pumps including centrifugal pumps are given as acceptable high-speed mixers. The majority notes these facts. It does not, however, seem to recognize the inherent qualification which is placed on the words "high speed mix-

er" (already qualified by the phrase "about 1000 rpm or more") by that portion of appellant's disclosure which states: *"In any event,* intimate mixing must be achieved in not substantially more than one minute. [Emphasis mine.]" Appellant clearly has indicated to one skilled in the art that a "high speed mixer" may be one which rotates at *less than* 1000 rpm. In fact, it would seem that if any feature of appellant's process be important, in addition to the carrying out of the initial phosgenation at a temperature within the range of 60°C. to 80°C., it would be, as stated in the specification, that *"intimate* mixing of the amine and phosgene [be accomplished] in a short period of time of say from 3 or 4 seconds or *not substantially more than about one minute."* (Emphasis mine.) As discussed infra, however, the omission of a limitation in the instant claims relating to this latter point should not be considered *by this court* to render them defective.

I find in appellant's specification repeated references to the fact that appellant considers the particular *speed* of the mixer unimportant. Appellant's reference to a mixing period of from "3 or 4 seconds" to "more than about one minute" indicates to me that "intimate mixing" may be accomplished by *various* mixer speeds. Factors which obviously would affect mixing speeds would include the amount of amine and phosgene mixed and the speed with which these constituents are brought together in the primary phosgenating zone. These somewhat elementary considerations are confirmed by statements in appellant's specification to the effect that *"Depending upon the speed of the mixer,* the reactants may be fed to the mixer continuously *at any rate desired."* (Emphasis mine.) I note that, in reaching their decisions, neither the examiner nor the board discusses the obvious significance of the last quoted sentence in appellant's specification. The majority states that this sentence "must be considered in connection with the remaining language of the paragraph in which it appears."

Accordingly, the majority would amend this sentence to read as follows: "Depending upon the speed of the *high speed* mixer, the reactants may be fed to the *high speed* mixer continuously at any rate desired." (Emphasis mine.) I find such a consideration singularly unpersuasive on the issue before us. Of utmost importance is the failure of the majority to consider that the quoted sentence cannot properly be considered in the light of only one paragraph of appellant's specification but must be considered in the light of the entire specification. The majority fails to acknowledge that the very words "high speed" as they appear in this paragraph are repeatedly qualified elsewhere in the specification. It is manifest to me, therefore, that one skilled in the art, reading appellant's disclosure, would realize that if, in carrying out the initial phosgenation at a temperature within the range of 60°C. to 80°C., "the reactants" were to be "fed to the mixer" at a relatively low rate, speeds considerably below 1000 rpm could be used. Mixing could still be "intimate" and take place in "not substantially more than about one minute"— indeed in a much shorter time.

The majority appears to attach to the phrase "high speed mixer" a connotation which primarily relates to *residence time* rather than to the rate of agitation during the *mixing* process. For example, the majority clearly considers the "high speed" of the *mixer* as relative to the *"time* of prior art *mixing."* (Emphasis mine.) Careful study of the record fails to show any support for this position. On the contrary, there is evidence in the record that the examiner felt the concepts of residence time and rate of agitation to be separate and distinct. In his action of April 26, 1960, the examiner rejected certain claims as "too broad" because, in *addition* to a "high-speed mixer" limitation, one relating to "residence time" was not included. If, as defined by the majority, a "high-speed mixer" necessarily refers to a mixer in which the *time* of mixing is relatively short, what purpose would be served by a separate

recitation relating to "residence time"? The answer is, none. In this regard, I note further that only four of fourteen allowed claims contain limitations to *both* a primary-phosgenation-residence-time and a "high speed mixer." I can only conclude on the basis of these facts that the Patent Office has decided that appellant has sufficiently disclosed the utility of an organic isocyanate producing process which does *not* require specific residence times in the primary phosgenation step. To raise the objection which the majority now raises, that the claims on appeal should contain a limitation *relating* to a mixing *time,* to my mind raises an issue clearly not raised by the board nor in the examiner's Answer. Such action by this court is clearly not in compliance with the statutory mandate that we "determine such appeal on the evidence produced before the Patent Office," 35 U.S.C. § 144, and can only lead to further litigation by way of a justifiable Petition for Rehearing.

The issue which faces us in this appeal, as previously indicated, can and should be decided simply on the basis of what *appellant* considered to be a "high speed mixer" and whether such a mixer is required by his disclosure, viewed in its entirety, as essential to the practice of his invention.

Inasmuch as it is the majority's position as well as that of the Patent Office that a "high speed" mixer is essential to appellant's process, it may well be asked what the utility may be of a procedure disclosed by appellant's specification, which does not require in its broadest aspects a particular rate of agitation. Appellant's specification answers this question by stating:

> "Inasmuch as it is not necessary to cool the reaction mixture in the primary phosgenation step, the subsequent hot phosgenation step may be effected within a shorter period of time than has been possible heretofore.
>
> \* \* \* \* \* \*
>
> "The temperature of the reactor used for the hot phosgenation may be

maintained at the desired reaction temperature from the very outset which makes it possible to carry out the hot phosgenation continuously.

> \* \* \* \* \* \*
>
> "The invention is most advantageous if the hot [i. e., secondary] phosgenation is effected continuously since the time required for the hot phosgenation is very short in comparison with the time required in the heretofore available methods. Consequently, the throughput of product in a given sized apparatus can be much greater than the throughput with one of the heretofore available processes."

It appears, therefore, that *one aspect* of appellant's invention is a method for producing organic isocyanates which allegedly is *faster* than prior art methods because secondary or hot phosgenation may be accomplished quicker as a result of the elevated temperature (60°–80°C.) at which primary phosgenation takes place. With respect to *this aspect* of appellant's invention, the only requirement I see as to mixing speed in appellant's disclosure is that "intimate mixing must take place."

It is only with respect to those objects of appellant's invention which deal with high *yields* and very high weight rates of production or "throughput" that the Patent Office position with regard to high mixing speed is somewhat persuasive. As to *yield,* appellant's specification states:

> "As pointed out hereinbefore, temperatures of above 60°C. were detrimental and had to be avoided for best results in the primary phosgenation step of prior processes. Very surprisingly, however, it has now been found that temperatures of above 60°C. do not adversely affect the yield when mixing is effected in a high speed mixer."

Mixing speeds of "(r.p.m. $>$ 1000)" are *specifically required* in several of appellant's examples wherein yields in excess of 95% are alleged, and higher weight

rates of mixing (on the order of 1 lb. per minute or greater) are involved.

It is clear to me, therefore, that while the *ultimate* goal of appellant's invention is its utilization in *large scale* production of organic isocyanates, I think that the cornerstone of this ultimate goal was appellant's discovery that organic isocyanates could be produced, without the formation of undue amounts of undesirable by-products, by means of a two-step phosgenation process in which the primary phosgenation is carried out within the range of 60°–80°C. and in which particular mixer speeds are not required.

I am, therefore, of the opinion that appellant's disclosure is sufficient to support claims 10–20.