54 CCPA

**Application of Julian Robert Anthony BEALE.**

**Patent Appeal No. 7755.**

United States Court of Customs and Patent Appeals.

June 15, 1967.

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. The Schwartz et al. patent issued to International Business Machines Corporation, Sept. 26, 1961, and the claims were copied by an amendment dated Feb. 5,

Jack Oisher, Briarcliff Manor, N. Y., for appellant.

Joseph Schimmel, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH, ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the rejection of claims 52–54 of application serial No. 676,563, filed August 6, 1957, originally entitled "Method of Manufacturing Semi-Conductor Devices."

Appellant Beale copied the three appealed claims from Schwartz et al. patent (hereinafter "Schwartz") No. 3,001,895 [1] to provoke an interference. They stand rejected on the sole ground of lack of support in Beale's specification. The examiner's language was that the claims are "unwarranted by the disclosure."

1962. Beale's application appears to be assigned to North American Philips Co., Inc., and has been involved in three other interferences, Nos. 92,269; 92,270; and 92,271. Beale prevailed in the first two and the third was dissolved.

The single issue in this case presents a simple problem of law, which turns on a single word, against the background of a very complex technology, some understanding of which is necessary to a comprehension of the issue.

The process of the appealed claims is directed to the making of junction transistors and is, we are told, now known in the art as the alloy-diffusion process.

The claims are broad enough to cover the making of either P–N–P or N–P–N junction transistors but the drawings and illustrative embodiments in both cases relate to the P–N–P type and we shall therefore use that type in explaining the invention. Reproduced below are Figs. 2, 3, and 4 of Schwartz showing stages in the production, followed by Fig. 1 which illustrates a finished transistor.

In viewing these drawings it should be borne in mind that they are in reality schematic diagrams greatly exaggerated in size and not showing the various parts in their true relative proportions.

Referring to Figs. 2, 3, and 4, a small piece or wafer of semiconductor material 11, such as germanium (Ge) of p-type conductivity, is provided by diffusion with a relatively thin surface layer 12 of opposite or n-type conductivity, the two layers providing a PN junction 5. As shown in Fig. 3, a small quantity or pellet 13 of alloy is placed on an exposed surface of layer 12, heated to a temperature above its melting point but below the melting point of the germanium crystal, held at temperature for a desired

time and then cooled, producing a structure illustrated in Fig. 4.

The controversy here revolves about the composition of alloy pellet 13. According to the claims, it comprises a "carrier" and two conductivity-type directing impurities which are of opposite types. In this art, one impurity is known as an acceptor impurity which creates p-type conductivity when incorporated in a semiconductor body and the other is known as a donor impurity which creates n-type conductivity in a semiconductor body. Exemplary materials involved in this case are gallium (Ga) which is an acceptor and antimony (Sb) which is a donor. The n-type layer 12 in Figs 2 and 3 may be produced by diffusion of Sb into the surface of the Ge crystal 11. One of Schwartz' alloy examples is 96.6%

lead [2] as carrier, 0.2% antimony and 0.2% gallium. To indicate the true size of what is shown in the drawings in an actual transistor, the Ge crystal wafer is described in one Schwartz example as .06 x .06 inch, and .006 inch thick. The other example describes the Ge crystal as .0023 inch thick with arsenic, another donor impurity, diffused into its surface to produce the n-type layer to a depth of 0.0005 inch. Pellet 13 is described as a .01 x .01 inch cylinder.

There are other qualifying factors with respect to the acceptor and donor impurities contained in the alloy pellet of importance to the practice of the claimed invention. The donor is selected so that it has a much higher diffusion constant than the acceptor, that is, it advances faster into the crystal from the melt. The impurities are also selected so that the acceptor solubility in the germanium is higher than that of the donor.

Referring to Fig. 4, when the alloying pellet 13 containing the donor and acceptor impurities is fused to the crystal surface 12 by heating the pellet in contact with the crystal until it melts, a number of things occur. A small portion of the Ge crystal dissolves in the melt, forming a small crater the depth of which represents the furthest advance of the melt (liquid-solid inter-face or alloy-front), determined by the temperature and the solubility of the Ge in the alloy. The melt quickly saturates and can accept no more Ge. Solid-state diffusion of the impurities in the melt takes place into the underlying Ge solid crystal 11. The donor, having the higher diffusion constant advances faster into the Ge. Heating is continued until the advancing donor impurity converts the underlying p-type Ge to n-type Ge, shown at 12A. It will be noted that this n-type layer joins the diffused n-type layer 12, previously formed. The n-type Ge layer, 12–12A, constitutes the active "base"

layer of the transistor. Its position in the crystal and particularly its thickness are important to obtaining the desired electrical characteristics and the invention involves control of these parameters but it is not deemed necessary to decision to discuss them.

As the melt cools, further significant events take place. Diffusion terminates, fixing the location of the collector-base junction, portion 11 of p-type Ge becoming the "collector." As the melt begins to solidify, the solubility of the Ge dissolved in it decreases and atoms of Ge precipitate out and regrow at the original solid crystal lattice, forming a recrystallized Ge region 6. The impurities having been selected so that acceptor solubility in the Ge was higher than that of the donor, more acceptor impurities exist in the recrystallized Ge region 6 than donor impurities with the result that region 6 exhibits p-type conductivity and forms an "emitter" junction with the adjacent diffused base region 12A. The cooled pellet 13, being metallic, forms an ohmic [3] conductive contact to the emitter recrystallized region. A conductor 8 may be attached thereto as shown in Fig. 1. A collector contact and conductor 10 are attached to the other side of the original Ge crystal and a base contact 9 is applied to surface 12, thus producing the finished transistor of Fig. 1.

We have used the Schwartz drawings only because they seem easier to read and are more detailed but Beale's drawings show substantially the same thing, additionally showing an oven in which the melting can be done in a hydrogen atmosphere and in the presence of a vaporized antimony source as a donor impurity to provide the diffused n-type conductive layer 12 on the original p-type germanium crystal wafer 11. Typical heating is to 700–800° C. for from 20 minutes to an hour.

2. What makes up the balance to 100% is not stated. At another point he discloses 99.6% lead and 0.2% each of antimony and gallium, which totals 100%.

3. An "ohmic" contact is defined in the transistor art as one which does not rectify or inject excess carriers. Hunter, "Handbook of Semiconductor Electronics," p. 3–14, Sec. 3.8.

Claim 52, which may now be at least partially intelligible to the reader, is as follows:

52. The process of making a transistor comprising, a first step of heating a semiconductor body of an original conductivity-type in contact with a material *comprising a carrier*, capable of forming an alloy with said semiconductor body at a temperature below the melting temperature of said body, and selected quantities of an original and an opposite conductivity-type directing impurity, said opposite conductivity-type directing impurity having a diffusion co-efficient greater than the diffusion co-efficient of said original conductivity-type directing impurity, said original conductivity-type directing impurity having a segregation co-efficient greater than the segregation co-efficient of said opposite conductivity-type directing impurity, said heating step being performed at a temperature above that at which said carrier is molten and below the melting temperature of said body, said quantities of said original and said opposite conductivity-type directing impurities being so selected and said heating step being continued at said temperature for such a time that only said opposite conductivity-type directing impurity diffuses significantly into said body to a predetermined depth thereby forming by said diffusion only a single region in said body, which region is of opposite conductivity-type to said body; and a second step of cooling said body thereby forming by segregation a recrystallized region of said original conductivity-type in said body and applying an ohmic contact to each of said original conductivity-type portion of said body and recrystallized region. [Emphasis ours.]

Claim 53 differs from 52 in specifying the step of forming a diffused layer (12) in the body *before* the alloying step and claim 54 differs from 53 in specifying that the base zone (12A) formed by diffusion during the alloying process is an extension of the original prediffused surface layer (12). The significant thing is that all three claims contain the words "comprising a carrier," "carrier" being the single word creating the issue here.

The Patent Office does not question appellant Beale's support in his disclosure for every element or step recited in the process claims other than the "carrier." Adverting to the claim language, what do we find with respect to the carrier in plain English? The reference is to the pellet of alloying material 13, above described. That pellet is referred to in the claims as "material." The material "comprises" (1) a "carrier" capable of forming an alloy with the semiconductor body and of melting at a temperature below the melting temperature of said body and (2) two conductivity-type directing impurities of opposite type and having certain other specified characteristics not relevant to the issue.

In copying the claims and presenting his justification under Patent Office Rule 205(b), Beale pointed out that he discloses the use of an alloying material in the form of a pellet of indium (In) containing the acceptor gallium (Ga) and the donor antimony (Sb), both well-known conductivity-type directing impurities. The examples on which he relied give the alloy ingredient proportions as 99% In, 1% Ga in Example 1, modified in Example 3 by inclusion also of 0.2% Sb.[4] He therefore relies on indium

4. His full Rule 205(b) statement with respect to the alloy reads:

Example 3 on page 12, which incorporates Exs. 1 and 2 by reference, describes a process for making a transistor in which a p-type Ge body is heated in contact with an indium pellet.

Ge melts at 950° C but In alloys with Ge at 700° C.

The In pellet contains the acceptor Ga and the donor Sb, well-known impurities. For completeness, Ga has a much higher segregation co-efficient in Ge than In. See USP 2836521, col. 3, USP 2977262, and 2862840.

as his disclosure of carrier, in which are carried the two different type donor and acceptor impurities antimony and gallium. While, in our view, it is not important to the legal issue, the "carriers" disclosed in the Schwartz patent are lead or tin, the example of lead containing as impurities gallium and antimony, 0.2% each; the tin example includes 0.2% each of copper and antimony.

In his initial refusal to admit the claims, the examiner took the position that they were "unwarranted by the disclosure" because "There is no basis in the applicant's specification * * * to support the inclusion of a carrier in the alloy dot material." To support this (it not being denied that Beale does not use the *word* carrier) the examiner insisted that it was *not* "recognized" in the specification that indium was a carrier but that it *was* recognized that indium was an acceptor impurity. He took this to indicate the assumed fact with respect to applicant's state of mind that "applicant did not recognize that In was acting as a carrier * * *." We think it is of no legal significance here whether Beale either recognized all aspects of the role of indium or indicated recognition in his specification.[5] The question here is whether he discloses subject matter conforming to each and every limitation of the copied claims and if, in fact, indium functions as a carrier in his disclosed process then his disclosure supports the claims, all other limitations concededly being met. The examiner's next action was his final rejection in which he repeated the same reasons. Appeal to the board was then taken.

██ It is appropriate to mention here the principle of law that unambiguous terms in copied claims will be given the broadest meaning they will reasonably support and that limitations will not be read into them. Field v. Stow, 49 F.2d 840, 18 CCPA 1437 (1931). Using the same *words* in a disclosure as are used in the claims is not always the determining factor in determining the issue of support. In re Walter, 292 F.2d 547, 48 CCPA 1094 (1961). It has not been shown to our satisfaction that there is anything ambiguous or unusual about the word "carrier" in this art, replete though it is with unusual terminology. We are of the opinion that Beale is within his rights in relying, as he does, on the dictionary definitions of the word. Nor, having in mind certain arguments of the examiner in his answer, does it appear to us that Schwartz, were we to consider his specification relevant, used the word in any unusual way. He speaks of a "carrier material," of "carrier metal," and of the "carrier." It is simply a metal which carries other ingredients, all of them together constituting the alloy 13.

In his answer, the examiner makes extensive arguments additional to those in his rejections in an attempt to justify his initial opinion that Beale's specification does not support the claims only because of their inclusion of the word "carrier." In doing this he examines into what Schwartz uses for carriers, what he says about the reasons for using these materials, lead and tin, and considers whether Beale obtains the same or similar advantages in using his own alloy, in which he asserts indium acts as a carrier. We regard as legally unjustifiable this attempt to limit the meaning of "carrier" by reference to the Schwartz specification. While it may be that Schwartz gets some results from using the carriers he specifically discloses, which may or may not be obtained using appellant's indium, he has not limited the claims to the carriers he discloses or even to similar "electrically inert"

Sb, a donor, has a greater diffusion constant than the acceptor Ga.
Ga, the acceptor, has a higher segregation constant than Sb.

5. One fact which cannot be gainsaid is that as soon as Beale saw the Schwartz patent and read its claims he "recognized" the 99% indium in his alloy pellet as corresponding to the lead or tin which Schwartz chose to define in his claims as "carrier."

metals. He has specified "carriers" broadly, and that is a functional term. In our judgment, if Beale's indium, as used, functions as a carrier, that limitation is satisfied. In re Walter, supra.

Having considered the Beale disclosure, the prior art patents and texts relied upon by Beale to illuminate the technical aspects of this invention, and the arguments presented, we are persuaded that in Beale's disclosed process the indium does function as a carrier within the intendment of that term as used in the claims. We so hold notwithstanding the fact that it also has the properties of an acceptor impurity. There is no apparent reason why it cannot have these properties and also function as a carrier, when used in the quantity relative to the other alloy ingredients disclosed by Beale.

We are, therefore, constrained to disagree with the grounds presented by the examiner for refusing to admit the claims and to declare the interference.

The board, in a very short opinion, appears to have predicated its affirmance on a ground entirely different from that advanced by the examiner, a ground also urged upon us by the solicitor. If we read the opinion aright, the board begins with the admission that according to Beale's disclosure—to use the board's own words—"Indium thus serves as a carrier." But, says the board, indium is described as an acceptor and the specification gives the impression (to the board) "that the acceptor indium must be used in combination with certain conductivity type directing impurities for obtaining his desired result." This led the board to conclude, apparently, that only one carrier is disclosed and hence to this further conclusion:

> We find no disclosure or suggestion therein that any carrier as now broadly claimed could be employed in appellant's process. Therefore, we agree with the Examiner that the claims on appeal are unwarranted by the disclosure. * * * We call attention to a more pertinent decision, In re Gemassmer, 138 USPQ 230, 51 CCPA [729], [319 F.2d 541], where a critical limitation

in appellant's application was held insufficient support for broader claims copied for purpose of interference. [Emphasis ours.]

Thus it appears to us that whereas the examiner based his rejection on his opinion that no carrier was disclosed by Beale, the board found indium to be a carrier and then proceeded to its own determination—never hinted at by the examiner—that disclosure of a single carrier or a particular desired carrier was not support for a claim containing a broad provision for a carrier. This is a complete shift of position. The examiner and the board found the claims "unwarranted" for entirely diferent reasons. The Patent Office brief before us recognizes this in stating:

> The examiner held that appellant never recognized indium as a carrier in his disclosure (R–80), but the Board held that appellant disclosed the use of indium as a carrier (R–93). However, the Board held that appellant has made "no disclosure or suggestion therein that any carrier as now broadly claimed could be employed in appellant's process" (R–94).

The solicitor's brief then proceeds to limit "carrier" to what he thinks Schwartz meant by the term by limiting it to the class of carriers he disclosed (lead and tin, electrically inert) and from then on alternates the argument between saying Schwartz and Beale made "different" inventions, so that "carrier" must be so limited it does not find support in indium, and saying "carrier" is so broad it cannot find support in a single carrier, indium. The major emphasis seems to be on the breadth argument but they appear side by side in the following passage:

> Appellant has disclosed a different invention from that of the patent, and as a matter of principle, appellant should not be allowed to make claims to a different or broader invention, In re Sus, supra. [49 CCPA 1301, 306 F.2d 494, 134 USPQ 301.]

It is clear that appellant's disclosure of only one specific material that acts

as a carrier does not support the broad terminology of the appealed claims.

■ Whichever way the rejection is argued, we find it lacking in merit. Our study of the patent and the application convinces us that Schwartz and Beale made essentially the same invention, not different inventions.[6] They use different carriers but they are a minor aspect of the invention as a whole. The record shows that carriers are an old tool in this art. Neither Schwartz nor Beale devised them and the invention of neither resides in the carrier per se. As one example we may cite French patent 1,128,-423 published prior to appellant's filing date in which indium, lead, tin, and other metals, are all disclosed as constituting 95% or more of alloys also containing doping impurities and used to form emitter electrodes, wherein it would seem appropriate to characterize them as "carriers."

By virtue of this same fact, that carriers for conductivity-type directing impurities are old in the art, and because the invention resides in the *process* as defined by the other limitations of the claims, in combination, to produce the process as a whole, we cannot agree with either the board or the solicitor (the examiner never having made the argument) that, in defining the process as a whole, "carrier" is a term which requires for support disclosure of more than one carrier. We note that Schwartz was granted his patent with that term in his claims on the basis of mention of only two, lead and tin, both of the *same* inert type. No one has yet argued that Beale's process would not *infringe* the claims. The situation seems to us parallel to the disclosure of a device made up of several elements, one of which is a rivet or a bolt described in the claim as "fastening means." Normally one would not be required to disclose more than one such means to support the claim. Wheth-

er lead, tin, or indium be used as the carrier, substantially the same process is carried out and essentially the same product results, at least as far as the record shows. While there may indeed be minor differences, they have not been pointed out in the claims as part of the invention.

The *Gemassmer* case, cited by the board, does not seem to us to be in point. The majority in that case deemed the use of a high speed mixer to be a *critical* "limitation" of the process invented and disclosed and ruled that claims not containing a limitation to a high speed mixer did not "point out appellant's invention." Here we do not deem the use of indium to be a critical "limitation" of the appellant's process, and neither has the Patent Office, as is indicated by the allowance to appellant of many claims without any such limitation. In any event, that is not the question here, which is whether indium functions as a carrier so that claims calling for a carrier find support in the disclosure.

Appellant has succinctly summed up in his brief the essence of his invention in the following statement:

The only requirements to carry out this invention were the presence of an electrode that could form a melt with the semiconductor containing both acceptor and donor impurities, one of which would diffuse rapidly into the underlying crystal to form the base region and the other of which would dominate the recrystallized region formed during cooling to form the emitter region. Thus, the indium disclosed in the specific example in Beale's application performed a *dual function*. First, part of it acted as the active acceptor, namely, those atoms of the indium that were retained in the recrystallized region, constituting less than 0.001% of the indium present.

---

6. It does not appear to us that appellant was ever previously faced with this "different invention" argument of the solicitor, either before the examiner or the board. He should not be required to meet new rejections for the first time in this court.

*Second, it served as a carrier or vehicle for establishing a melt* containing dissolved semiconductor material for introducing into that melt some of itself as the acceptor and the donor impurity incorporated in it, from which melt the donor would diffuse into the underlying crystal.

Appellant has further made it clear that in the example relied on the indium also contained the acceptor impurity gallium which has far greater (100 times) solubility in germanium than indium wherefore for every atom of indium substituted for a germanium atom in the crystal lattice there will be many more atoms of gallium substituted, with the result that the determination of the p-type conductivity will be overwhelmingly due to the gallium and the relative effect of the indium will be negligible. The solicitor has not controverted this argument.

Because we are convinced that appellant's disclosed use of indium in his alloy is in fact as a carrier for the gallium and antimony contained therein as conductivity-type directing impurities, because we see no necessity for any disclosure of additional carriers, others of which were known to the art, to support the term in the claims of the type here involved, and because appellant's invention does not reside in the selection the carrier named by way of example, we consider the rejection on the ground of lack of support, however rationalized, to be unwarranted.

The decision of the board is reversed.

Reversed.

WORLEY, C. J., did not participate.

SMITH, Judge (concurring).

I concur in the result reached here by the majority because the Patent Office has failed to establish through competent proofs either that the term "carrier" is a limited term or that appellant's specification does not disclose a "carrier" to one of ordinary skill in the art, 35 U.S.C. § 112. The rejection is based on section 112 and I believe appellant has overcome this rejection. In my opinion, based on the evidence of record, appellant's "right to make" the counts in an inter partes proceeding is an open question.